# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 03-CV-4892 (JFB) (MLO)
_____

ATRONIC INTERNATIONAL, GMBH,

Plaintiff,

VERSUS

SAI SEMISPECIALISTS OF AMERICA, INC.,

Defendant.
_____

MEMORANDUM AND ORDER
September 15, 2006
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Atronic International, GmbH ("Atronic"), brought this action against defendant SAI Semispecialists of America, Inc. ("SAI"), claiming breach of contract regarding the sale of computer semiconductor chips. Plaintiff moves for partial summary judgment, seeking a finding from the Court that defendant breached its contractual obligations as a matter of law. Defendant cross-moves for summary judgment, and plaintiff also moves to strike evidence from defendant's summary judgment evidence. For the reasons stated below, plaintiff's motion to strike is granted, and both parties' motions for summary judgment are denied in their entirety.

I. BACKGROUND

A. Factual Background

The following facts are undisputed, unless otherwise indicated. This action concerns the sale of goods, specifically computer semiconductor chips known as Texas Instruments TMS 34020 AGBL-32 graphics processors ("TI Graphics Processors"). (Pl.'s Rule 56.1 Statement ("Pl.'s 56.1") ¶ 1.)[1] SAI is an electronics distributor which holds itself out as specializing in the sale of obsolete and hard-to-find electronics parts. (*See* Declaration of John J. Witmeyer III, dated October 12, 2005 ("Witmeyer 10/12/05 Decl."), Ex. A, at ¶ 2.) Atronic manufactures and sells video gaming equipment, which incorporates electronic components. (Compl. ¶ 5.) SAI and Atronic have done business together since 1997. (*See* Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 1.).

On or around September of 2001, Tom Kelly, a SAI sales representative, placed a call to a product manager within Atronic's

___

[1] Where only one party's 56.1 Statement is cited, the other party does not dispute the facts alleged.

Research and Development Department. (*See* Pl.'s 56.1, ¶ 2.) Kelly asked the Atronic manager if there were any components that Atronic had difficulty obtaining. (*See id.*) In response to an inquiry regarding TI Graphics Processors, Kelly sent a written quotation, dated September 18, 2001, stating that he could supply 50,000 TI Graphics Processors, at $69 each. (Atronic Req. Admit ¶¶ 1A & 2(1), Witmeyer 10/12/05 Decl., Ex. L; admitted, *see* Witmeyer 10/12/05 Decl., Ex. M.) The parties negotiated a potential transaction through September and October of 2001. (*See* Pl.'s 56.1, ¶ 4.)

On October 18, 2001, Atronic sent a written purchase order to SAI, numbered 4500166782, via e-mail. (*See* Pl.s' 56.1, ¶ 5.) The purchase order indicates that Atronic was ordering 20,000 TI Graphics Processors at $69 each. (*See* Witmeyer 10/12/05 Decl., Ex. I.) The order also provides a delivery schedule of 32 TI Graphics Processors per month. (*See id.*) The order includes language about the first shipment date, stating that the first shipment was to be made on April 1, 2002, or before, if requested by Atronic with 14 days notification. (*See id.*) Finally, the order includes language regarding a potential option for Atronic to purchase additional TI Graphics Processors at the contract price:

> Atronic has the right to purchase additional 20.000 Graphic Processors . . . as specified above under the same conditions until December 31st [sic], 2001.

(*Id.*)

SAI responded to the purchase order by requesting a change in the start date for delivery of the components. (*See* Pl.'s 56.1 ¶ 6.) Kelly faxed a copy of the October 18 purchase order back to Atronic, with the following hand-written notations: (1) he wrote the number of the purchase order at the top; and (2) he circled the clause describing the start date as being April 1, 2002, and wrote "To Be Removed!" next to it. (*See* Witmeyer 10/12/05 Decl., Ex. I.) In response, Atronic wrote an e-mail, dated October 19, 2001, attaching a revised purchase order. (*See* Witmeyer 10/12/05 Decl., Ex. J.) The introduction of the e-mail discussed the alteration of the start date:

> although it does not match our material demands, we have to accept the fact that You [sic] have to start shipping as early as November of 2001. As discussed please find below an updated version of the purchase order. Our order # is 4500166782. Please confirm the acceptance of the order by email until the end of the day.

(*Id.*) The attached purchase order indicates a first shipment date of November 2001, rather than April 1, 2002. (*See id.*) Otherwise the terms are identical to the one included in the prior version, including quantity (20,000), price ($69 per unit), delivery schedule (1,500 per month) and a verbatim option clause (option to purchase an additional 20,000 units under the same conditions by December 31, 2001). (*See id.*)

Later that day, Jochen Meyer, Vice President for Global Operations at Atronic e-mailed SAI, stating in relevant part: "Since I have not received Your [sic] order confirmation yet, I wanted to ask You [sic] to call in case of problems." (*See* Pl.'s 56.1, ¶ 8.) SAI responded by e-mail, stating in relevant part: "There are no problems. Everything is on schedule." (*See id.*, ¶ 9.) In November 2001, SAI shipped 1,500 TI Graphics Processors to

Atronic. (*See id.,* ¶ 10.)

Although SAI does not dispute that the aforementioned communications took place, it alleges that the agreement between the parties included the condition that the TI Graphics Processors were subject to "prior sale," meaning that they would provide them at the agreed upon price as they became available on the market. Kelly testified at his deposition that the TI Graphics Processors were not in possession of SAI and were subject to prior sale. (*See* Def.'s 56.1, ¶ 2.) Further, Christopher Conner of SAI testified at his deposition that he told Atronic that they refused to sign the contract with the terms and conditions e-mailed to them, and that they would treat it as an open purchase order that they would use their best efforts to fulfill. (*See* Def.'s 56.1, ¶ 4.) Atronic disputes these assertions, noting evidence in the record in which Hartwig Schuemann, Atronic's purchase manager at the time, testified that nobody told him that the parts were subject to prior sale, as well evidence in the record that Connor admitted that he did not recall speaking to anyone at Atronic in October of 2001. (*See* Plaintiff's Responses to Defendant's 56.1 Statement, ¶¶ 2, 4.)

Atronic claims that in mid-December, 2001, Schuemann exercised the option on the additional 20,000 TI Graphics Processors. (*See* Declaration of Hartwig Schuemann ("Schuemann Decl."), ¶ 3.) SAI disputes the fact that Schuemann exercised the option in December of 2001, citing, *inter alia*, an e-mail sent by Schuemann to SAI on February 27, 2002, wherein Schuemann stated that 20,000 TI Graphics Processors were ordered the previous year, and inquired as to whether the option from the agreement could be exercised to order 10,000 additional TI Graphics Processors.[2] (*See* Declaration of Peter G. Goodman ("Goodman Decl."), Ex. I.)

As of November 2002, SAI had delivered less than 20,000 TI Graphics Processors to Atronic. (*See* Pl.'s 56.1, ¶ 12.) By e-mail dated January 7, 2003, Helmut Dorst, SAI's Senior Buyer Vice President, informed Atronic that "[a]s per telecom 7th January 2003, please be advised that we can fully support balance of order on video ram only. Regarding processor, we cannot at this time advise any exact delivery schedules due to unforeseen market circumstances." (Witmeyer 10/12/05 Decl., Ex. O.)

SAI ultimately delivered only two-thirds of the 20,000 TI Graphics Processors from the original order. (*See* Pl.'s 56.1, ¶ 15.)

B. Procedural History

This case was re-assigned to the undersigned from the Honorable Thomas C. Platt on February 23, 2006. Oral argument was held on the pending motions on July 14, 2006.

II. STANDARD OF REVIEW

Pursuant to Federal Rules of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a

---

[2] SAI cites other correspondence written by Schuemann to undermine his assertion that he exercised the option. The correspondence is described *infra* in detail, in the context of the Court's discussion of the issue of whether the option was exercised.

3

matter of law." FED. R. CIV. P. 56(c)*; Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (stating that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005).

## III. DISCUSSION

At this juncture, the Court is presented with three motions: (1) Atronic's motion for partial summary judgment as to the issue of breach of contract; (2) SAI's cross-motion for summary judgment; and (3) Atronic's motion to strike a piece of evidence from consideration within the context of SAI's cross-motion for summary judgement.

### A. Atronic's Summary Judgment Motion

Atronic moves for partial summary judgment, desiring the Court to find as a matter of law that SAI breached contractual obligations to: (1) deliver 20,000 TI Graphics Processors under the initial terms of the parties' agreement; and (2) deliver 20,000 additional TI Graphics Processors pursuant to the option in the parties' agreement.

As a threshold matter, the parties dispute whether there was mutual assent between the parties to the terms in the October 19, 2001 revised purchase order. Atronic offers several theories under which such order became a binding sale of goods contract between the parties. Atronic asserts that either: (1) Kelly's fax constituted a counteroffer to the offer made in the original October 18, 2001, purchase order e-mail, which was subsequently accepted by Atronic's e-mail response to the fax on the following day; or (2) a contract was formed through the "merchant exception" of NY UCC § 2-201(2) when Atronic sent the October 19 e-mail in confirmation of the contract, and SAI failed to object to it in writing within 10 days.

Under either theory of contract formation, Atronic must overcome the hurdle presented by the Statute of Frauds under the Uniform Commercial Code. According to NY UCC § 2-201(1):

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties

4

and signed by the party against whom enforcement is sought or by his authorized agent or broker . . .

NY UCC § 2-201(1). In the instant case, there is no sufficient writing signed by the party to be charged, SAI, to satisfy the Statute of Frauds. Although Atronic argues that the Kelly's fax constituted a valid counteroffer, the document, which merely consisted of hand-written notations upon Atronic's October 18 purchase order, contained no signature or other notation which demonstrates an intent to authenticate the writing for the purposes of the statute of frauds. *See Parma Tile Mosaic & Marble Co., Inc. v. Estate of Short*, 87 N.Y.2d 524, 528-29 (N.Y. 1996) (holding that automatic imprinting of sender's name at top of each page transmitted by fax machine did not satisfy subscription requirement of Statute of Frauds, where the party to be charged did not otherwise mark the document with an intent to authenticate the writing for Statute of Frauds purposes).

However, notwithstanding the absence of a document subscribed by SAI for Statute of Frauds purposes, Atronic may nevertheless proceed on their breach of contract claim based upon the "merchant exception" provided by NY UCC § 2-201(2):

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

NY § UCC 2-201(2). This section recognizes the common practice among merchants to enter into oral sales agreements, which are later confirmed in writing by one party. *See Bazak Int'l Corp. v. Mast Indus. Inc.*, 73 N.Y.2d 113, 121 (N.Y. 1989). "Absent such a provision, only the party receiving the confirmatory writing could invoke the Statute of Frauds, giving that party the option of enforcing the contract or not, depending on how advantageous the transaction proved to be. UCC 2-201(2) was intended to address that inequity; it encourages the sending of confirmatory writings by removing the unfairness to the sender." *Id.* (citation omitted) The merchant exception of § 2-201(2) applies in this case to Atronic's theory that their October 19, 2001 revised purchase order constituted a confirmation of their prior contractual negotiations because it was sufficiently subscribed by Atronic, and SAI did not provide a written objection to its contents within ten days of receipt.

However, although the merchant exception allows Atronic to proceed with their breach of contract claim despite the Statute of Frauds, it does not establish that there was mutual assent to the terms in the October 19 revised purchase order, as a matter of law. The *only* consequence of the merchant exception is to remove the bar of the Statute of Frauds. *Mast Indus.*, 73 N.Y.2d at 122 ("[A]s additional protection against abuse and inequity, we note that the consequence of a failure to give timely written notice of objection to a confirmatory writing is only to remove the bar of the Statute of Frauds."); *Bazak Int'l Corp. v. Tarrant Apparel Group*, 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005) ("Even while asserting a contract under UCC Section 2-201(2), parties must still demonstrate the element of mutual assent."). As stated by the New York Court of Appeals:

The burden of proving that a contract was indeed made remains with the plaintiff, as does the burden of proving the terms of the contract. By the same token, the defendant remains free to urge that no contract was made, or that it differed from the one claimed by plaintiff (UCC 2-201, official comment 3). Thus, UCC 2-201(2) neither binds the receiving merchant to an agreement it has not made nor delivers an undeserved triumph to the sending merchant. It does no more than permit the sender to proceed with an attempt to prove its allegations.

*Mast Indust.,* 73 N.Y.2d at 122-23. Since the Court finds that the October 19 revised purchase order merely constituted a confirmatory communication under NY UCC § 2-201(2), its terms do not conclusively dictate the terms of the alleged contract between the parties. Although Atronic is certainly permitted to argue that they and SAI mutually assented only to the terms included within the October 19 revised purchase order, a finder of fact is not limited to the four corners of that document in determining the contents of the agreement between the parties. Accordingly, in its opposition to Atronic's motion for summary judgment, SAI has pointed to evidence in the record that the agreement between the parties included different or additional terms–namely, the condition that the order was "open" and "subject to prior sale." Specifically, Kelly testified at his deposition that he repeatedly informed Atronic that the order was "open" and "subject to prior sale," and that Atronic "would do [their] best to meet the delivery schedule they had . . . and being subject to prior sale." (*See* Goodman Decl., Ex. E, at 21, 27-29, 51-52.). Moreover, Connor testified at his deposition that SAI informed Atronic that SAI refused to sign contracts with the terms included in their e-mailed purchase orders, and that they would be treated as an "open purchase order." (*See* Goodman Decl., Ex. L, at 218.)

If SAI's evidence that the agreement between the parties included a provision that the order was subject to prior sale is credited, as this Court must in considering the instant motion for summary judgment, there exists a disputed issue of material fact as to whether SAI breached the terms of the agreement, either as to the initial 20,000 TI Graphics Processors, or as to the additional 20,000 option processors. Accordingly, Atronic's motion for summary judgment is denied.

B. Atronic's Motion to Strike

Atronic moves to strike a piece of evidence from consideration in the defendant's summary judgment motion. Specifically, plaintiff challenges defendant's reliance on a letter written by David Mousel, Esq., counsel for Atronic to SAI, dated March 6, 2003 (hereinafter "Mousel Letter").[3] The letter informs SAI that the TI Graphics Processors are critical to Atronic's manufacturing operations, and the fact that SAI had not provided all agreed upon units had caused a "significant reduction in production capacity." (Goodman Decl., Ex. M.) The letter explains that Atronic had placed SAI on notice that it would treat the lack of assurances that contract minimums would be resumed a "material breach" and would look to SAI to cover additional costs associated with obtaining the required TI Graphics Processors from a different source. (*Id.*) The letter proceeds to

---

[3] The letter in question is attached as Exhibit M to the Supplemental Declaration of Peter G. Goodman.

state that under the terms of the contract, "SAI was to have delivered 20,000 of the graphics processors at the rate of 1,500 per month." (*Id.*) The letter demands payment for the difference in costs associated for obtaining the processors from a different source, and states that if SAI did not pay those damages within two days, "Atronic shall seek such other avenues of redress as may be available to it. This will include the commencement of an action for all damages incurred." (*Id.*)

SAI relies on the Mousel Letter as evidence in support of its contention that Atronic did not timely exercise its option to purchase 20,000 additional units because the letter only claims that 20,000 units were due under the contract. In the instant motion to strike, Atronic claims that SAI may not rely on this document in support of its motion for summary judgment because it would not be admissible in evidence. *See* Fed. R. Civ. P. 56(e) (stating that in support of a summary judgment motion, "supporting and opposing affidavits . . . shall set forth such facts *as would be admissible in evidence . . .*") (emphasis added). Specifically, Atronic avers that the letter is inadmissable as a settlement offer, under Rule 408 of the Federal Rules of Evidence:

> (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

FED. R. EVID. § 408; *see also Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 826-27 (2d Cir. 1992) (finding settlement offer inadmissible); *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 510 (2d Cir. 1989) (holding that settlement documents could not be used in opposing summary judgment motions because the documents comprised inadmissible evidence); *Municipal Capital Appreciation Partners, I, L.P. v. Page*, 181 F. Supp. 2d 379, 386 n.3 (S.D.N.Y. 2002) (refraining from relying on settlement documents in deciding summary judgment motion).

SAI advances three arguments as to why Rule 408 should not apply to bar the admissibility of the Mousel Letter, asserting that: (1) it was not an attempt at compromise, but rather a demand letter; (2) it did not involve a dispute relating to the 20,000 option processors; and (3) it falls within the "another purpose" exception. The Court addresses each argument in turn.

First, the Court rejects SAI's argument that the Mousel Letter is not rendered inadmissible by Rule 408 because it is a demand letter. The plain language of Rule 408 indicates that it applies to promises to accept valuable consideration in attempting to compromise a claim. Nowhere does the rule expressly exclude demand letters, and the Court finds that demand letters can fall into the ambit of the exclusionary power of the rule, so long as the letter offers a compromise of the claim in exchange for satisfaction of the demand.[4] As

---

[4] Where a letter provides solely demands and lacks any suggestion of compromise, such a document would not be excludable by Rule 408. *See, e.g., Sunstar, Inc. v. Alberto-Culver Co.,* No. 01-CV-0736, 2004 WL 1899927, at *22 (N.D. Ill. Aug. 23, 2004) (excluding cease-and-desist letters under

7

applied to the facts of the instant case, despite the fact that the letter asserts a demand for payment of the entire amount of actual damages specifically assumed by Atronic's endeavors to acquire outstanding TI Graphics Processors from another source, the letter referenced a prior warning that failure to assure that the breach would be cured would compel Atronic to seek "additional costs incurred in securing another source to fulfill the contract volume *and for any consequential damages* incurred." (Goodman Decl., Ex. M) (emphasis added). Additionally, the letter concludes by indicating that payment of the demand will prevent Atronic from seeking redress for "*all* damages incurred." (*Id.*) (emphasis added). Atronic's representation is plainly a promise to accept consideration to compromise the full extent of their contract claim, and thus falls within the ambit of the plain language of Rule 408.[5]

---

Rule 408 because the letters "fail tocontain any suggestion of compromise"). SAI cites *Ullman v. Olwine, Connelly, Chase, O'Donnell & Weyher*, 123 F.R.D. 237, 242 (S.D. Ohio 1987) in support of its position, but that case is distinguishable because there is no indication that the letters at issue in that case contained anything more than demands and threats of litigation.

[5] Judge Posner authored a particularly instructive opinion in *Winchester Packaging, Inc. v. Mobil Chemical Company,* 14 F.3d 316 (7th Cir. 1994). There, the plaintiff sent the defendant a demand letter, threatening litigation, in which it failed to include substantial damages incurred through acquisition of an $800,000 loan that was obtained for the purpose of servicing the terminated contract with defendant. *See id.* at 318. At trial, plaintiff made a claim, and received damages in part for that loan. *See id.* The trial court rejected defendant's attempts to admit the letter, pursuant to Rule 408, to show that plaintiff had not previously interpreted the termination clause in the contract as incorporating such damages. *See id.*

On appeal, the Seventh Circuit recognized the rule that a mere "bill that itemizes what the sender thinks the recipient owes him and demands–even under the threat of legal action . . . is not an offer in settlement or a document in settlement negotiations and hence is not excludable by force of Rule 408." *Id.* at 319. The court indicated that approaching the issue *de novo*, it might have concluded that the letter making a demand and referencing possible litigation was nothing more than a bill and not a settlement document for the purposes of Rule 408. *See id.* The court concluded, however, that the district court had not abused its discretion in finding that the letter constituted a settlement offer because the district court may have plausibly inferred from the facts– that plaintiff had already engaged lawyers and had sent successive correspondence–that plaintiff was "groping for a sum to charge [defendant] that would be low enough to induce [defendant] to pay rather than fight; so viewed, the letters were indeed settlement offers and not merely computations of the bill owed by [defendant]." *Id.* The court also noted that the letter could be seen as an inducement "that would avoid the necessity of incurring any additional legal costs." *Id.* (internal quotation omitted). The Seventh Circuit concluded that on that reasonable interpretation of the correspondence, "it would run contrary to the letter and spirit of Rule 408 to penalize [plaintiff] for the inducement by allowing [defendant] to treat it as an admission that [plaintiff] was owed no more." *Id.* In the instant case, there is similar evidence that Atronic already retained counsel, sent successive correspondence regarding the contract dispute, and specifically requested payment to avoid liability of additional legal costs, all of which were the factors from which the Seventh Circuit concluded that a district court could, within the bounds of its discretion, exclude the evidence under Rule 408. *See id.; Pierce*, 955 F.2d at 827 ("[W]here a party is represented by counsel, threatens litigation and has initiated the first administrative steps in that litigation, any offer made between attorneys will be presumed to be an offer within the scope of Rule 408. The party seeking admission of any offer under those circumstances must demonstrate

Second, the Court rejects SAI's argument that Rule 408 does not apply because the Mousel Letter does not relate to a offer to compromise a dispute regarding the 20,000 option processors. The Mousel Letter plainly deals with the controversy of the alleged breach of the contract between the parties in general, not with just the specific dispute over damages assumed by Atronic's effort to find another source for the initial 20,000 TI Graphics Processors.[6][7]

Finally, SAI argues that Rule 408 does not prohibit the admission of the Mousel Letter because of the "another purpose" exception; they claim that they are offering the letter for a purpose other than those prohibited by the rule. *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir. 1999) ("[E]vidence of a settlement agreement and its surrounding circumstances though otherwise barred by Rule 408, can fall outside the Rule if it is offered for 'another purpose' i.e., for a purpose other than to prove or disprove the validity of the claims that [the agreement was] meant to settle.") (internal quotations and alteration omitted). A district court has "broad discretion as to whether to admit evidence of settlement . . . offered for 'another purpose,'" and in exercise of such discretion, "the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Id.*; *Trebor Sportswear*, 865 F.2d at 510 ("Care should be taken that an indiscriminate and mechanistic application of this 'exception' to rule 408 does not result in undermining the rule's public policy objective . . . . The court should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations.")

SAI asserts that the "other purpose" exception applies because they are not offering the Mousel letter to demonstrate a concession of liability on Atronic's part; rather, they are offering the evidence for what the letter does *not* say–that Atronic believed that were entitled to the 20,000 processors under the option clause. In support of the proposition that Rule 408 does not prohibit the admission of settlement documents into evidence for the purpose of what they do not say, SAI relies upon the analysis of a Magistrate Judge's Report and Recommendations in *Sunstar, Inc. v. Alberto-Culver Co., Inc.,* No. 01-CV-0736, 2004 WL 1899927 (N.D. Ill. Aug. 23, 2004). In *Sunstar,* the court consulted the consideration given by Professors Wright and

---

convincingly that the offer was not an attempt to compromise the claim.") Moreover, there is stronger evidence in the instant case that the Mousel Letter was correspondence offering a compromise because it explicitly indicated that there were consequential damages other than the additional cost of obtaining processors from another source, which they would seek if SAI did not comply with the demand. (*See* Goodman Decl., Ex. M.)

[6] As previously stated, the Mousel Letter references damages other than extra costs associated with obtaining replacement processors, and also threatens to commence litigation to recover all damages if the demand is not satisfied. (*See* Goodman Decl., Ex. M.)

[7] SAI relies upon *Walsh v. First UNUM Life Insurance Company*, 982 F. Supp. 929 (W.D.N.Y. 1997), but that case is plainly distinguishable. In *Walsh*, the court allowed the admission of settlement evidence because there was contemporaneous evidence that defendant "did not dispute plaintiff's claim, as is required under [Rule] 408, but rather approved it." 982 F. Supp. at 931. Here, there is no indication that SAI approved of Atronic's claim; rather, the evidence was that there was a general dispute regarding breach of the alleged sale of goods agreement between the parties.

Graham to the issue of "whether Rule 408 bars evidence that there were no offers of compromise, or more realistically, that certain statements were not made during compromise negotiations." *See id.*, at *23 (citing Wright & Graham, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5309, at 239 (1980)). According to the court:

> "[S]uppose that in a dispute over the meaning of a contract, one of the parties offers evidence that during attempts to settle the disagreement his adversary never advanced the construction of the contract that he is now urging on the jury." *Id*. Wright and Graham noted that such evidence would be circumstantial evidence of offers to compromise but concluded that Rule 408 does not prohibit admission of evidence that certain statements were not made during compromise negotiations. "Read literally, Rule 408 would not seem to prohibit evidence that an offer of compromise was not made or that certain statements were not made during negotiations. Nor does there seem any strong policy reason for departing from the literal interpretation." *Id.*

*Sunstar*, 2004 WL 1899927, at *23. Since the *Sunstar* court and the parties were unable to find any authority dealing with the issue, the court found Professor Wright and Graham's analysis persuasive, and concluded that Rule 408 did not bar the statements at issue.

This Court, however, disagrees with the *Sunstar* analysis. As a threshold matter, the blind application of the bright-line rule promoted by Professors Wright & Graham–that the text of Rule 408 should compel a finding that it never bars the admission of settlement statements to show that certain things were not said–would plainly contravene the Second Circuit's admonition that the "another purpose" exception not be mechanically applied to the extent, such that it undermines Rule 408's purpose of promoting the settlement of disputes. *See Starter Corp.,* 170 F.3d at 293; *see also Trebor Sportswear*, 865 F.2d at 510.[8] Moreover, the Court is not convinced by the Wright & Graham analysis that the plain text of Rule 408 does not encompass the purpose for which SAI seeks to admit the Mousel Letter in the instant case. Rule 408 states that "offering or promising to accept, a valuable consideration . . . to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount." FED. R. EVID. § 408. Here, Atronic made an offer to compromise their breach of contract claim, which was disputed as to validity and as to amount, and SAI wishes to admit it now to demonstrate that the *amount* of the contract claim does not encompass damages from failure to deliver the option processors. The Court concludes, in the exercise of its discretion, that SAI is not offering the Mousel Letter for "another purpose" falling outside the prohibitions of Rule 408.[9]

---

[8] The rule is also in direct tension with the holding of the Seventh Circuit in *Winchester Packaging,* which concluded that the district court was within the bounds of its discretion in excluding a piece of correspondence under Rule 408 where it was offered to show that the plaintiff did not interpret a provision of the contract to cover a particular claim of damages, where the correspondence did not demand such damages. *See* 14 F.3d at 320.

[9] The cases cited by SAI that apply the "another purpose" exception are inapposite, as the evidence in those cases was offered for purposes other than

In sum, the Court concludes that Rule 408 of the Federal Rules of Evidence bars admission of the Mousel Letter. Accordingly, Atronic's motion to strike is GRANTED.

C. SAI's Summary Judgment Motion

SAI argues that it is entitled to summary judgment, dismissing the instant action, because Atronic failed to provide timely notification to SAI of the alleged breaches of the agreement between the parties. Alternatively, SAI avers that they are entitled to partial summary judgment, a finding that they did not breach as to the 20,000 option processors because Atronic did not exercise the option in a timely manner. The Court examines each argument in turn.

1. Timely Notification of Breach

SAI argues that Atronic is barred from pursuing any remedy for breach of the contract because of an alleged untimely notification to SAI of the breaches under Uniform Commercial Code § 2-607(3)(a).[10] That provision provides that where a tender of goods has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." NY UCC § 2-607(3)(a). "The notification need only alert the seller that the transaction is troublesome and does not need to include a claim for damages or threat of future litigation." *Computer Strategies, Inc. v. Commodore Bus. Machines, Inc.,* 105 A.D.2d 167, 176 (N.Y. App. Div. 1984) (citations omitted). Although reasonableness of a delay is normally a question of fact for a jury, courts have found some delays unreasonable as a matter of law. *See, e.g., Cafaro v. Emergency Servs. Holding, Inc.,* 11 A.D.3d 496, 499 (N.Y. App. Div. 2004) ("The plaintiffs established their entitlement to judgment as a matter of law by demonstrating that the defendant [buyer] first notified them that the products were defective more than 16 months after discovery of the alleged defect and that the notification was thus untimely as a matter of law.") (citing NY UCC § 2-607(3)(a)); *Mt. Vernon Mills, Inc., v. Murphy Textile Mills*, 148 A.D.2d 389, 390 (N.Y. App. Div. 1989) (holding seven month delay unreasonable as a matter of law under § 2-607(3)(a)).

Specifically, SAI asserts that Atronic should have been aware of the delivery problems as early as January 2002, the first month they claim that SAI fell short of delivering 1,500 TI Graphics Processors. SAI believes that Atronic did not properly alert them of the breach until December 10, 2002, when Atronic sent the letter to SAI requesting confirmation that the outstanding TI Graphics Processors would be delivered. SAI argues that the resulting delay, which exceeds ten months, is unreasonable as a matter of law under § 2-607(3)(a), and thus bars Atronic's claim for recovery under the contract.

As a threshold matter, the Court finds that § 2-607(3)(a) is inapplicable to Atronic's specific breach of contract claim for TI

---

demonstrating the amount of the claim at issue. *See Sage Realty Corp. v. Ins. Co. of N. Am.*, 34 F.3d 124, 128 (2d Cir. 1994) (permitting admission of document to prove that defendant had certain documents in its possession); *see also Starter Corp.,* 170 F.3d at 294 (permitting admission of approved settlement document to demonstrate equitable estoppel claim arising from alleged false representations made in the document).

[10] This argument assumes, *arguendo*, that SAI entered and breached the contract alleged by Atronic.

Graphics Processors that they never received under the agreement. The plain language of § 2-607 indicates that the clause only prohibits untimely claims of breach pertaining to the specific goods that have actually been received. First, the precatory language states that the late notice provision applies "[w]here a tender *has been accepted*." NY UCC §2-607(3) (emphasis added). The next subsection states that "[t]he burden is on the buyer to establish any breach *with respect to the goods accepted.*" NY UCC § 2-607(3)(a).[11] This language indicates that the notice requirement applies only to breach with respect to the actual goods accepted, i.e., claims that the goods received were non-conforming, defective, or received late. In fact, all of the cases cited by SAI where courts have found notice to be unreasonably late as a matter of law, involve situations where the alleged breach concerned the actual goods received. *See Cafaro*, 11 A.D.3d at 499 (finding that notification of *defective* goods *received* was untimely); *Mt. Vernon Mills*, 148 A.D.2d at 390 (finding claim for damages arising from the late delivery of goods barred by excessive delay in providing notice from the time at which the goods were delivered in full); *Liberty Steel Products, Inc. v. Franco Steel Corp.,* 57 F. Supp. 2d 459, 469 (N.D. Ohio 1999) (finding that claim for damages for receipt of non-conforming goods was barred under New York law because notice of breach was untimely).[12]

However, even if the prohibition of § 2-607(3)(a) applies to facts of this case, it would not bar a claim for breach in this case because Atronic is not claiming breach from the insufficiency of any particular shipment, but rather decrying the fact that SAI breached by representing that they will not be able to fill the contract minimums *at any time*. As of the first incomplete shipment in January of 2002, Atronic at best knew or should have known, that SAI was breaching the agreement by not consistently shipping the required monthly processors in batches of 1,500 every month in a timely manner. Atronic did not know, and did not have reason to believe, that SAI would fail to *ever* deliver at least the 20,000 TI Graphics Processors, for which they contracted. Atronic's belief that they would eventually receive the processors is made even more reasonable by the fact that SAI represented in July 2002 that they would make up previous shortfalls in upcoming weeks. (*See* Goodman 12/16/05 Decl., Ex. F at 293-95.)[13] There is nothing in the record that would support a finding that Atronic should have known about the fact that SAI was not going to

---

[11] In fact, the bulk of the provisions of § 2-607(3) applies only to the goods which have actually been accepted. Subsection (1) states that "[t]he buyer must pay at the contract rate for *any goods accepted.*" NY UCC § 2-607(1) (emphasis added). Similarly, subsection (2) asserts that "[a]cceptance of goods by the buyer precludes rejection *of the goods accepted . . .*" NY UCC § 2-607(2) (emphasis added).

[12] At oral argument, SAI conceded that they were unable to find any authority supporting the application of § 2-607(3)(a) to bar a breach of contract claim for untimely notification that contracted for goods were not received at all.

[13] SAI's evidence demonstrates that they quickly attempted to make up for shortfalls in later weeks. For example, the records they submitted indicate that they delivered 4,659 TI Graphics Processors to Atronic on August 7, 2002. (*See* Declaration of Christopher Conner ("Connor Decl."), Ex. A.) After that date, deliveries slowed again, but that large shipment itself would give confidence to Atronic that SAI could eventually satisfy contract minimums.

supply the full contract minimums, until they received the January 7, 2003 e-mail which indicated that SAI could not assure Atronic that they would.

In sum, the Court finds that § 2-607(3)(a) does not bar Atronic's breach of contract claim.

2. Option Processors

In the alternative, SAI argues that, even if a finder a fact was to determine that the contract between the parties did not include the condition that they would be subject to prior sale, they argue that they would nevertheless be entitled to summary judgment as to the 20,000 processors provided for in the option clause because Atronic failed to exercise the option prior to its expiration date. According to the term of the option clause in the October 19 revised purchase order, Atronic had "the right to purchase additional 20,000 Graphic Processors . . . as specified above under the same conditions until December 31, 2001." (Witmeyer 10/12/05 Decl., Ex. J.)

Atronic argues that it did in fact exercise the option–they claim that Schuemann orally accepted it in mid-December. Scheumann has testified to this fact, both during his deposition, and in a declaration submitted in support of the instant motion for summary judgment. (*See* Witmeyer 10/12/05 Decl.*,* Ex. D. at 261, 272, 274, 276; *see also* Schuemann Decl., ¶ 3.)

SAI argues that, notwithstanding this evidence, the Court should find that Atronic failed to communicate to SAI their intent to exercise the option as a matter of law. SAI points to a wealth of evidence to undercut Schuemann's assertion that he exercised the option. First, they note that at his deposition Schuemman admitted that he did not take any notes reflecting such a conversation with SAI, although he had a note in his journal reflecting a conversation with Meyer. (*See* Goodman Decl., Ex. H at 271. SAI also highlights the fact that Schuemann could not recall with certainty the employee he spoke to at SAI regarding the option. (*See* Goodman Decl., Ex F at 275.)[14] Schuemann also admitted at his deposition that he did not tell SAI to begin shipments pursuant to the option. (*See id.* at 278.)

Other than concessions made by Schuemann at his deposition, SAI also points to correspondence to undermine the credibility of his claim that he exercised the option. In a February 27, 2002 e-mail to SAI, Schuemann references a conversation that he had with SAI the previous day, and asked for confirmation that Atronic could exercise the option pursuant to a specified delivery schedule. (*See* Goodman Decl., Ex. I.) SAI argues that Schuemann would not inquire about whether he could exercise the option if he already had exercised it. Further, in a November 22, 2002 letter from Schuemann to Atronic's counsel, Schuemann asserts that a total of 20,000 TI Graphics Processors were initially ordered, and makes no mention of additional option processors. (*See* Goodman Decl., Ex. G.)[15]

---

[14] Atronic points out the fact that, earlier in the deposition, Schuemann indicated that he believed the SAI employee he spoke to was Tom Kelly. (*See* Witmeyer Decl., Ex. D, at 273.)

[15] Although this communication would normally be privileged, the privilege was waived because Atronic produced them in discovery. The Court has previously ruled that SAI could use this e-mail in the instant litigation. *See Atronic Int'l, GMBH v. SAI Semispecialists of Am., Inc.,* 232 F.R.D. 160, 166 (E.D.N.Y. 2005).

13

Similarly, a December 10, 2002 letter sent to SAI requests written confirmation that they will receive the 7,100 processors remaining on the contract. (*See* Connor Decl., Ex. C.) The letter indicates that 12,900 had already been received, and makes no reference to the option processors. (*See id.*) Schuemann sent another e-mail to counsel, dated December 11, 2002, which also extensively discusses the dispute, but fails to reference the 20,000 option processors. (*See* Goodman Decl., Ex. J.)[16]

The Court finds that there exists a disputed issue of material fact as to whether Atronic exercised the option for the additional 20,000 processors in a timely manner. Although the inferences that may be drawn from Schuemann's admissions and correspondence undercut the credibility of Schuemann's testimony that he exercised the option in mid-December 2001, the Court cannot conclude that no reasonable jury could find that Schuemann did not exercise the motion, as a matter law. Viewing the evidence in a light most favorably to Atronic, fully crediting Schuemann's testimony and rejecting the inferences that SAI wishes to be drawn, a reasonable jury could find that the option clause had been exercised.[17] *Vital v. Interfaith Med. Center,* 168 F.3d 615, 621 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment.") Accordingly, the court denies SAI's motion for partial summary judgment regarding the option processors.[18]

IV. Conclusion

In sum, plaintiff's motion to strike the Mousel letter from evidence is GRANTED, and both parties' motions for summary judgment are DENIED.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: September 15, 2006
Central Islip, New York

\* \* \*

---

[16] As with the November 22, 2002 letter, this Court has previously held that attorney-client privilege has been waived with respect to Schuemann's December 11 e-mail. *See Atronic Int'l,* 232 F.R.D. at 166.

[17] To the extent that Atronic seeks summary judgment on this issue based on Schuemann's testimony, that motion is also denied. Viewing the evidence in a light most favorable to SAI, and drawing all inferences in its favor, including inferences from the correspondence sent by Schuemann after the alleged deadline for exercise of the option, inquiring as to whether or not he could exercise the option, and other correspondence in which he only references processors owed under the initial order, a reasonable jury could reject Schuemann's testimony that the option clause was exercised. In any event, as noted earlier, there is also an issue of fact as to the terms of any contract.

[18] The Court's conclusion would not be affected if it held otherwise on the motion to strike, discussed *supra*. The contents of the Mousel Letter are cumulative, and add nothing novel to the evidence presented and considered by the Court in the correspondence of November 22, December 10, and December 11, 2002.

14

The attorneys for the plaintiff are John J. Witmeyer, III, Esq., Edward M. Pinter, Esq., and Anthony Pirraglia, Esq., of Ford Marrin Esposito Witmeyer & Gleser, LLP, Wall Street Plaza, New York, New York 10005-1875. The attorneys for the defendant are James J. O'Rourke, Esq. of James J. O'Rourke & Associates, PLLC, 235 Brooksite Drive, Hauppauge, New York 11788, and Peter G. Goodman, Esq., of Morgenthau & Greenes, LLP, 575 Lexington Avenue, New York, New York 10022.